**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| | : | |
| **GEORGE G. SHARP, INC.,** | : | Case No. 20-10590 (MEW) |
| | : | |
| Debtor. | : | |
| | : | |
| **DEBORAH J. PIAZZA, as Chapter 7** | : | |
| **Trustee of George G. Sharp, Inc.,** | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | Adv. Pro No. 21-1000 (MEW) |
| | : | |
| **PACIFIC MARITIME INDUS. CORP.,** | : | |
| | : | |
| Defendant. | : | |
| | : | |

## <u>DECISION DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

A P P E A R A N C E S

TARTER KRINSKY & DROGIN LLP
New York, New York
  BY: Jill Makower, Esq. (Telephonically)
  *Attorneys for Deborah J. Piazza, Chapter 7 Trustee*

LAW OFFICES OF CLINTON D. HUBBARD
San Diego, California
  BY: Clinton D. Hubbard, Esq. (Telephonically)

  - and-

MILLER JOHNSON LAW
San Diego, California
  By: Jon Bernard Miller, Esq. (Telephonically)
  *Attorneys for Pacific Maritime Industries Corp.*

**HON. MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

Debtor George G. Sharp, Inc. ("Sharp") entered into a contract with the U.S. Navy, and

in order to fulfill that contract Sharp ordered materials from Pacific Maritime Industries Corp.

("PMI").  The parties agree that Sharp made payments to PMI during the 90-day "preference"

period that preceded Sharp's bankruptcy filing on February 25, 2020.  PMI contends that the

payments were prepayments and were not preferences, and that in any event the "new value"

defense shields PMI from liability.  The Trustee contends that the payments made by Sharp were

made under a contract entered months before the payments were made; that the payments

therefore were on account of an "antecedent debt" that was "owed" by Sharp before the

payments were made; and that the "new value" defense is not available for various reasons.

PMI's motion for summary judgment, and the Trustee's cross-motion, were argued on

January 26, 2022.  On February 16, 2022 the parties filed additional submissions to address

questions the Court had raised.

### Jurisdiction and Constitutional Authority

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157

and 1334 and 11 U.S.C. § 547.  The parties agree that this Court has the statutory power and the

Constitutional authority to render a final decision, and they have consented to the entry of a final

judgment by this Court.  Complaint [ECF No. 1] ¶ 6; Answer [ECF No. 7] ¶ 6.

### Facts Not Subject to Genuine Dispute

The parties disagree as to how to characterize the facts and what labels to apply to them,

but for the most part the underlying events are not subject to genuine dispute.

1.      The parties agree that beginning in mid-2019, and continuing to the time of its

Chapter 7 filing on February 25, 2020, Sharp was not able to pay its debts as they came due.

2.      In 2019, Sharp issued two purchase orders to PMI for the proposed fabrication of

Navy shipboard furniture.  These purchase orders were issued to allow Sharp to fulfill its own

obligations under orders that the Navy had placed with Sharp.  One order (purchase order

ES12532) was issued on or about May 2, 2019 at a price of $661,749 before shipping. The other

order (purchase order ES12550) was issued on or about July 16, 2019 at a price of $105,290

before shipping. Each purchase order proposed a "net 45 days" payment term.

3.      In email exchanges on July 23, 2019 and July 29, 2019, PMI's Contracts Director,

Michael Edwards, informed the president of Sharp that two prior invoices to Sharp were past due

and that PMI had put the new purchase orders "on hold until we can work out payment terms."

4.      In an email dated July 30, 2019, Sharp informed PMI that it would not "pay in

advance." The record does not include any details as to any discussions or other

communications between the parties about this issue between July 30, 2019 and August 9, 2019.

However, apparently the parties had not reached agreement by August 9, 2019. In an email

dated August 9, 2019, Sharp's project manager, Paul Noftz, acknowledged that "the subject

purchase orders were on hold" pending (1) the payment of the outstanding balance on another

purchase order, (2) "[p]ayment schedules for the subject purchase orders;" and (3) resolution of

shipping costs.

5.      On August 15, 2019, Sharp requested that PMI provide invoices for the two

relevant purchase orders in order to help Sharp expedite payment from the Navy, so that Sharp

could expedite payment to PMI. Mr. Noftz told Mr. Edwards that Sharp had had success in

getting early payment from the Navy by presenting a supplier's early invoice.

6.      PMI provided Sharp with the requested invoices. The invoice for the larger

purchase order (No. ES12532) was dated as of August 1, 2019 and included a statement that

payment would be due within 45 days (*i.e.*, by September 15, 2019). The invoice for the smaller

purchase order (No. ES12550) was dated as of August 15, 2019 and also included a statement

that payment would be due in 45 days (*i.e.*, by the end of September 2019). There is no

information in the record as to what the parties' expectations were, at that time, as to when goods were to be delivered and as to whether these payment dates meant that payments would be made before, after, or roughly contemporaneously with the deliveries of goods.

7.      Some payments were made by Sharp prior to the 90-day preference period with respect to goods covered by Purchase Orders ES12532 and ES12550, including payments that were made prior to shipments that occurred on November 5, 2019.  During the Hearing, the parties agreed that Sharp had made payments for the November 5, 2019 shipments prior to the dates on which the shipments occurred and prior to the 90-day preference period, and that the Trustee does not challenge those payments.

8.      As of late October 2019 some portions of Purchase Order ES12532 remained open.  In a series of emails from October 30, 2019 through December 9, 2019, PMI asked Sharp when payments of the balances for this "large contract" would be made, and asked when PMI "will get paid in full for this large contract."  The emails stated that PMI otherwise was ready to deliver the items that Sharp had requested.

9.      On December 12, 2019 the Navy (by email) asked PMI whether the "material on the outstanding invoice that Sharp owes you is ready for shipment."  PMI responded that same day by noting the price of the remaining items and explaining that the "reason for COD payment is from previous PO's with George Sharp, they took a year and more to get the invoices paid, we could not let this happen on these large orders.  To complete this Order after payment has been received should take approx. 3 weeks."

10.     The record does not disclose whether the Navy made payments to Sharp in December 2019.  However, on December 13, 2019, Sharp sent a check to PMI in the amount of $246,769.65, which cleared on January 3, 2020.  On December 17, 2019, Sharp sent an

4

additional check in the amount of $200,000, which cleared on December 23, 2019. The Trustee

agrees that these checks represented payments with respect to the $446,769.65 of outstanding

items on purchase order ES12532. These are the two payments by Sharp that are at issue in this

adversary proceeding.

11.    PMI contends that Sharp maintained a positive credit balance with PMI (*i.e.*,

Sharp had paid more than it owed) throughout the preference period and that Sharp never owed

PMI money during that time. The Trustee takes issue with the characterizations of the various

payments as "prepayments" or as giving rise to "credit balances." However, the Trustee does not

dispute that during the preference period all payments were made before the deliveries of goods.

12.    On February 3, 2020, the Navy sent Sharp a list of materials "that George Sharp

has paid for, but that has yet to be shipped by Pacific Maritime," and asked Sharp to arrange to

have the remaining materials shipped to Q.E.D. Systems, Inc. ("Q.E.D.") rather than to Sharp.

On February 4, 2020, Sharp forwarded the list of materials it had received, and asked that PMI

ship the materials to Q.E.D. *Id*. Mr. Edwards responded by email that date and said PMI would

make the shipping arrangements. *Id*.

13.    PMI shipped $457,163 of goods to QED on or about February 5, 2020, March 4,

2020, March 5, 2020, March 18, 2020, April 15, 2020 and April 30, 2020. Some of those

shipments were made after the filing of Sharp's bankruptcy case on February 25, 2020.

## **Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a), which is applicable to this adversary proceeding

pursuant to Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment shall

be rendered if a movant shows that there is no genuine dispute as to any material fact and that the

movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law

determines the facts that are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). In considering a motion for summary judgment, the evidence is viewed in the light most

favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).

### The Parties' Contentions

Section 547(b) of the Bankruptcy Code allows a trustee to avoid certain transfers of

property made by an insolvent debtor within ninety days preceding the petition date, providing

five elements are established. One such element is that the transfer was made "for or on account

of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C.

§ 547(b)(2). Another element is that the transfer enabled the creditor "to receive more" than

such creditor would have received in a chapter 7 case if the transfer had not been made and if the

creditor had received payment to the extent provided under the Bankruptcy Code. *Id*. §

547(b)(5). A separate provision of section 547 provides a trustee may not avoid a transfer to the

extent that, after such transfer, the creditor "gave new value to or for the benefit of the debtor" on

account of which the debtor did not make an otherwise unavoidable transfer. *Id*. § 547(c)(4).

PMI argues that no "antecedent debt" was "owed" to PMI at the time of the two

payments that are at issue. PMI cites numerous decisions for the proposition that a payment is

"owed" when a debtor is legally obligated to pay, and that the legal obligation to pay is incurred

when the debtor obtains goods or services, regardless of whether a prior contract exists. *See,*

*e.g.*, *Pirinate Consulting Group, LLC v. Kadant Solutions Division (In re NewPage Corp.)*, 569

B.R. 593, 599-600 (D. Del 2017); *In Re Dots LLC*, 533 B.R. 432, 439 (Bankr. D.N.J. 2015); *In*

*re Vanguard Airlines, Inc.*, 295 B.R. 329, 334-35 (Bankr. W.D. Mo. 2003). PMI asserts that it

refused to ship goods unless it received payments in advance of shipment, and that such

payments in advance did not constitute preferences because they were not payments of

6

"antecedent debts" that were "owed" before the payments were made.  *Newpage,* 295 B.R. at

599 (quoting *Hechinger lnv. Co. of Del., Inc. v. Universal Forest Prods., Inc. (In re Hechinger*

*lnv. Co. of Del., Inc.)*, Adv. No. 01-3170 (PBL), 2004 WL 3113718 at *2 (Bankr. D. Del. Dec.

14, 2004) ("It is well established that advance payments are *prima facie* not preferences because

the transfer from the debtor to the creditor is not for or on account of an antecedent debt").  PMI

also contends that its post-payment shipments constituted "new value" and are a defense to the

Trustee's claims.

The Trustee agrees that no "preference" occurs if a contract requires a prepayment and if

a prepayment is made.  However, the Trustee contends that the contract in this particular case did

not legally obligate Sharp to make an advance payment.  The Trustee argues that the "debt" that

was "owed" by Sharp dates back to the date when the parties' contract was formed and the

original invoices were issued, even if the contract obligations were still unperformed and even if

the debt was contingent or unmatured at the time of the contract.  *See e.g.*, *Official Comm. of*

*Unsecured Creds. of Enron Corp. v. Whalen (In re Enron Corp.)*, 357 B.R. 32, 48-49 (Bankr.

S.D.N.Y. 2006) (retention bonus paid shortly before it was contractually earned was a payment

on account of an "antecedent debt" because the contingent obligation to pay the bonus was

incurred at a prior date).  Since Sharp made payments after the contract was formed, the Trustee

contends they were payments with respect to an antecedent debt that was "owed" before the

transfers were made, without regard to the dates on which products were shipped and without

regard to the fact that the payments preceded the shipments.

The Trustee further contends that PMI's post-payment shipments merely fulfilled PMI's

contractual obligations under the same contract under which payments had been made, and that

such shipments did not constitute "new value" because they did not represent separate and

independent transactions.  *See Gouveia v. RDI Grp. (In re Globe Bldg. Materials)*, 484 F.3d 946, 949 (7th Cir. 2007).  Finally, the Trustee argues that PMI's deliveries of goods to Q.E.D. did not constitute "new value" that was provided to or for the benefit of Sharp itself.

At the Hearing, the Court noted that the parties had discussed their respective interpretations of their contractual payment obligations but had failed to discuss certain relevant provisions of the Uniform Commercial Code and whether those provisions might have entitled PMI to a "prepayment" regardless of what the parties' underlying contract stated.  The parties made supplemental submissions to address the UCC issues on February 16, 2022.

PMI contends that, under section 2-609 of the Uniform Commercial Code, PMI had "reasonable grounds for insecurity" as to Sharp's performance of its payment obligations; that PMI was therefore entitled to "adequate assurance" of Sharp's performance; and that PMI also was entitled to suspend any performance for which it had not "already received the agreed return."  PMI further contends that its requests for payment prior to delivery constituted reasonable requests for "adequate assurance" under this provision.  *Rocheux Int'l of N.J., Inc. v. U.S. Merchants Fin. Grp., Inc.,* 741 F. Supp. 2d 651, 674 (D.N.J. 2010) (holding that "courts have generally eschewed applying formalistic requirements for the demand of adequate assurances").

The Trustee contends that section 2-609 is not relevant.  The Trustee argues that under section 2-609 of the UCC, the failure to provide adequate assurance constitutes a repudiation of a contract and that PMI never treated the parties' contract as having been repudiated.

## Discussion

**I.     Whether the "New Value" Defense Entitles PMI to Summary Judgment**

The parties concede that payment in this case occurred prior to a delivery of goods.  If, as

a result, the "new value" defense is applicable, then the other more complicated "antecedent

debt" issues that the parties have hotly debated will be irrelevant.  I will start then, with a

consideration of whether the "new value" defense supports the entry of summary judgment.

Section 547(c)(4) of the Bankruptcy Code provides that a trustee may not avoid a transfer

"to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new

value to or for the benefit of the debtor," so long as the new value has not been paid for by an

"otherwise unavoidable" transfer.  11 U.S.C. § 547(c)(4).  The Trustee argues that "new value" is

not provided when a preference defendant merely fulfills its delivery obligations under the same

contract under which a prior payment has been made.  In support of this proposition the Trustee

relies on the decision by the Seventh Circuit Court of Appeals in *Gouveia v. RDI Grp. (In re

Globe Bldg. Materials)*, 484 F.3d 946, 949-950 (7th Cir.2007) ("*Globe*").  In *Globe*, the debtor

made partial payments for equipment, and then the supplier shipped some equipment to the

debtor.  *Id*. at 948.  The supplier argued that it was entitled to a defense under section 547(c)(4)

because the supplier had provided new value when it shipped the equipment.  *Id*. at 949.  The

*Globe* court concluded, however, that because the supplier already had a legal duty to deliver the

equipment under the contract, the delivery of that equipment was not "new" value.  *Id*. at 949.

The Court does not believe that the *Globe* decision is sound and the Court declines to

follow it.  The purpose of the "new value" defense is to prevent a preference claim where the

estate has received goods, services or credit after the date of the transfer at issue, so that in effect

the estate has been made whole.  The definition of "new value" therefore picks up "money or

money's worth in goods, services, or new credit." 11 U.S.C. § 547(a)(2).  There is nothing in

that statutory language that supports the view that the "money or money's worth in goods,

services or new credit" must be provided under a completely new and different contract or

pursuant to a new and completely independent transaction.  To the contrary:  the plain meaning

of the words used in section 547 is that a delivery of goods after the date of a transfer constitutes

"new value" provided by the creditor.

Debtors often do business with suppliers on a "rolling account" basis, for example, under

which periodic deliveries are made.  In these circumstances, courts routinely treat subsequent

deliveries as "new value."  *See, e.g., Kaye v. Blue Bell Creameries, Inc. (In re BFW Liquidation,*

*LLC)*, 899 F.3d 1178, 1194-95 (11th Cir. 2018).  Sometimes such supply arrangements are

governed by single contracts, and sometimes they are governed by a series of contracts, but there

is no statutory reason why "new value" rules should apply differently depending on whether one

or more contracts is in place.  In *Ames Merch. Corp. v. Revere Mills Inc. (In re Ames Dep't*

*Stores, Inc.)*, Case No. 01-42217 (REG), Adv. Pro No. 03-03591, 2010 WL 2403104 (Bankr.

S.D.N.Y. 2010), for example, the parties entered into a Master Agreement for the purchase and

sale of towels. The contract required payments to be made before towels were delivered.  The

court declined to follow the *Globe* decision in deciding whether "new value" had been provided.

*Id*. at 7.  Instead, the court held that the transactions were not "credit transactions" and also that

new value had been provided because towels were delivered after payments had been made*.  Id.*

The "new value" concept also is used in applying the defenses that are available under

sections 547(c)(1) and 547(c)(3) of the Bankruptcy Code.  *See* 11 U.S.C. §§ 547(c)(1), 547(c)(3).

Section 547(c)(1) provides that a transaction is excepted from attack if a transfer is "intended by

the debtor and the creditor to or for whose benefit such transfer was made to be a

10

contemporaneous exchange for new value given to the debtor." *Id.* This defense is applicable if

parties make a contemporaneous exchange pursuant to a prior contract that requires such a

contemporaneous exchange, even though both parties (when they make the exchange) are

honoring prior contractual obligations. It would make no sense, in that context, to hold that the

defense is only applicable if the "new value" is provided pursuant to a "separate" contract.

Similarly, Section 547(c)(3) provides that a transfer that creates a security interest is exempt

from attack if the security interest secures "new value" that is used to acquire property that will

constitute collateral, so long as the security interest is perfected within 30 days after the debtor's

acquisition of the collateral. The defense is only applicable if the "transfer" of a security interest

is made to "secure" the new value that is provided, which means they must be part of the same

contract or transaction.

Given the way the term "new value" is defined and used throughout section 547

(including sections 547(c)(1) and 547(c)(3) as well as section 547(c)(4)), it is quite plain that the

"new value" definition only requires that a transferee provide goods, services or credit that the

debtor did not previously have. There is no requirement that such goods, services or credit be

provided under a "separate" contract or transaction.

The Trustee also contends that "new value" was not delivered to Sharp itself, because (at

Sharp's direction and at the Navy's direction) PMI shipped goods to another entity, Q.E.D., and

because some of the shipments did not occur until after the commencement of Sharp's

bankruptcy case. There is no information in the record before me as to the dates of payments

that the Navy may have made to Sharp, or as to the circumstances that surrounded the Navy's

instructions to Sharp or Sharp's instructions to PMI. A trial may show that the transfer of rights

to Q.E.D. and/or the subsequent shipments to Q.E.D. (made at Sharp's direction and apparently

in fulfillment of Sharp's contract obligations to the Navy) were made for "the benefit of" Sharp.

However, the details of those underlying arrangements are not set forth in the parties' summary

judgment papers, and so the record at this stage does not contain sufficient information to enable

a decision as to whether "new value" was provided "to or for the benefit of" Sharp.

Accordingly, summary judgment is not proper in favor of either party as to the "new value"

issues.

## II.     Whether Sharp Made Payments On Account Of An "Antecedent Debt" That Was "Owed" Before the Payments Were Made

If section 547 is to be applied in a principled and consistent way then one needs a clear

understanding of (a) what constitutes an "antecedent debt," and (b) when such a debt is "owed"

for preference purposes.  The term "antecedent debt" is also used in section 548 of the

Bankruptcy Code (in delineating a defense that may be asserted to a fraudulent transfer claim)

and in section 550 (in limiting the circumstances under which avoided transfers may be

recovered from subsequent transferees), and so that phrase should be given a consistent meaning

that works in all of these contexts.  However, the Bankruptcy Code does not specify when a

"debt" should be treated as an "antecedent" debt.  It also does not specify the rules that should be

applied in deciding whether and when a debt is "owed" by a debtor for purposes of section 547,

and whether that word means anything other than that a debt "exists," even if only in a

contingent form.  Not surprisingly, courts have interpreted these terms in many different ways.

In a 2006 decision, Judge Gonzalez of this Court aptly characterized the case law as follows:

> [M]ost courts invariably cite to the same vague legal maxims: namely, that an
> "antecedent debt" is a debt incurred before the transfer was made, and a debt
> is "incurred" when the debtor becomes legally obligated to pay.  However,
> while seemingly definite, these principles only restate the key question,
> shifting the inquiry from the meaning of "antecedent debt" to the meaning of
> "legally obligated to pay."  Thus, courts can cite to the same axioms while
> reaching irreconcilable results, each embracing a different understanding of

12

"legally obligated to pay." The principal question under this standard, obviously, is what sort of legal obligation is required to create a debt for purposes of section 547, and to this question a range of answers have been offered.

*See Enron,* 357 B.R. at 39.

The case law since 2006 has continued to reflect differing approaches to the determination of when an "antecedent debt" is "owed," and the parties have adopted very different views of the issue in connection with the pending motions. Reconciling the competing threads in the reported decisions is difficult if not impossible. *Enron* offered one well-considered interpretation of the relevant terms, but as described below that interpretation is not fully consistent with a more recent decision by the Second Circuit Court of Appeals. The countervailing issues, court decisions and statutory interpretation principles are discussed below.

### A. The Statutory Language

The starting point to the interpretation of section 547 must be with the terms and definitions that appear in the Bankruptcy Code. The Bankruptcy Code defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5). The term "debt" means a "liability on a claim." 11 U.S.C. § 101(12). The Supreme Court has confirmed that the terms "debt" and "claim" are "coextensive," so that the expansive language in the definition of "claim" is equally applicable to the term "debt." *See Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 558 (1990).

The Trustee argues that every contract, at the time of its creation, gives rise to a "claim" and therefore to a "debt," even if the debt is contingent or unmatured. The Trustee further argues that any payment that is made after the date on which a contract is formed is a payment made with respect to an "antecedent" debt, taking the view that "antecedent" just means "prior in

13

time."  Many courts have drawn similar conclusions, including the court in the *Enron* decision.

The argument is relatively straightforward and for the most part produces consistent results.  It

would mean (in a case such as this one) that any payment under a contract that is not

contemporaneous with the formation of the contract itself would be a payment with respect to an

"antecedent debt."  Such a payment would not be a fraudulent transfer, but it could be a

"preference" unless one or more of the defenses in section 547(c) were available.  Payments

made at the time that goods are delivered would only be protected to the extent that a

"substantially contemporaneous exchange" defense could be asserted under section 547(c)(1);

payments made in the ordinary course of business would only be protected to the extent that such

a defense was available under section 547(c)(2); and payments made prior to deliveries of goods

or services would only be protected to the extent that the "new value" defense could be asserted

under section 547(c)(4).

One potential problem with this approach, however, is that section 547(b)(1) does not

merely refer to a transfer made with respect to "antecedent debt."  Instead, it applies to a transfer

made for or on account of an antecedent debt "owed by the debtor before such transfer was

made."  The Trustee argues that every contractual debt is "owed" at the time the contract is

executed, even if the obligation is contingent and even if the contract is completely unperformed.

If that is true, however, then Congress could and should have said merely that section 547

applies to any transfer made "for or on account of an antecedent debt," or possibly even "for or

on account of a debt."  All of the extra words that appear in the statute – "owed by the debtor

before such transfer was made" – would have no additional meaning or effect.

The usual rule of statutory construction is that words used in a statute are assumed to

have significance, and therefore are not to be treated as though they have no meaning and are

mere surplusage.  *Loughrin v. United States,* 573 U.S. 351, 358 (2014); *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (a "cardinal principle" of statutory interpretation requires that courts "give effect, if possible, to every clause and word of a statute").  It is noteworthy that section 60(a) of the Bankruptcy Act, which governed "preference" liabilities prior to the enactment of the Bankruptcy Code, defined a "preference" as a transfer of property "to or for the account of a creditor for or on account of an antecedent debt . . ."  *See* Bankr. Act § 60, sub. a(1), 11 U.S.C.A. § 96, sub. a(1).  The words "owed by the debtor before such transfer was made" were added when Congress enacted the Bankruptcy Code.  This deliberate addition to the prior statute presumably served some purpose and therefore should be given effect.

Unfortunately, the intended meaning of the additional words is a mystery.  Remarkably, we have not found any legislative history or contemporaneous commentary that explains the addition of the words "owed by the debtor before such transfer was made."  In the *Enron* decision, Judge Gonzalez noted that one possible explanation of the added language is that Congress sought to limit the application of section 547 to a "subset" of debts:

> If an antecedent debt is defined as a debt that arose prior to payment, the phrase "owed by the debtor before such transfer was made" appears superfluous.  One solution to this apparent problem is immediately obvious: while debt is defined as a liability for payment that may be contingent, unmatured, disputed, unliquidated, etc., the language that the antecedent debt be "owed" before transfer may be argued to limit the application of section 547(b) to a subset of debts.  This limitation may be narrowly construed to apply only to contingent debts, or it may be broadly construed to apply to all debts not matured, fixed, or reduced to judgment.

*Id*. at 48 (citations omitted).  If that were what Congress intended, however, it is hard to understand why Congress did not choose words that mirrored the words already used in the definition of "debt" and that would have more clearly conveyed what was intended – by referring, for example, to "noncontingent" debts or to "matured" debts.  There are some other provisions of the Code that do use such qualifying terms.  *See, e.g.*, 11 U.S.C. § 109(e)

(describing chapter 13 eligibility in terms of persons who owe "noncontingent, liquidated, unsecured debts" of less than a specified amount); 11 U.S.C. § 542(b) (requiring payment by entities that owe a debt to a debtor "that is matured, payable on demand, or payable on order").

In *Enron*, Judge Gonzalez offered a different possible explanation for the added words:

> However, the better alternative is to focus not on the concept "owed" but on the phrase "by the debtor." The phrase "owed by the debtor before the transfer was made" thus does not express a temporal concept like the phrase "antecedent debt," or a legal concept like "legally obligated to pay," but rather a concept of identity. Only those transfers on account of an antecedent debt owed by the debtor are subject to avoidance under section 547(b); transfers on account of an antecedent debt owed by a third party are not. . . . Thus, for example, a payment by the debtor of an affiliated entity's debt would not be a preference unless the debtor was in some fashion liable for that debt, as would be the case where the debtor guarantees the affiliate's debt in case of default. In all other cases, the transfer would not be a preference, though it would likely be a fraudulent conveyance.

*Id*. (citations omitted). We are not aware, however, of any particular confusion in the prior case law as to whether a preferential transfer had to be a transfer with respect to the debtor's own antecedent debt as opposed to a debt owed by someone else. In addition, this explanation does not appear to explain all of the language that was added to the statute. If the purpose of the language was to specify that the debt had to be owed by the debtor (as opposed to being owed by someone else), then the statute only needed to refer to an "antecedent debt owed by the debtor" or to an "antecedent debt of the debtor." That is, in fact, how the statute handles a similar concept in connection with fraudulent transfer claims. *See* 11 U.S.C. § 548 (stating that "value" for purposes of section 548 includes the satisfaction of a present or antecedent debt "of the debtor.") If the term "antecedent debt" already includes all pre-existing obligations of all kinds (including contingent and unperformed contract obligations), then the requirement that the debt must have been owed by the debtor "before the transfer was made" would still be superfluous.

16

In any event, I find it difficult to conclude that the words "owed by the debtor before the
transfer was made" merely focus on the identity of the obligor and do not express a temporal
concept.  Plainly the added words do express a temporal concept as to when a debt was "owed"
by the debtor.  I can think of no other reasonable way to interpret the phrase.

Of course, human beings make mistakes and sometimes use more words than are
necessary, even when drafting statutes.  Perhaps (consistent with Judge Gonzalez's hypothesis)
the reference to a debt being "owed" by a debtor "before the transfer was made" was just a belt-
and-suspenders way of saying not only that the debt had to precede the transfer, but also that the
debtor's own liability with respect to the debt had to precede the transfer.  In that regard,
however, there is a separate problem with this interpretation of the statute: namely, that the
Second Circuit Court of Appeals has recently taken a very different view of when an "antecedent
debt" is "owed" by a debtor.

### B.    The Second Circuit's *Tribune* Decision

In its papers, the Trustee has cited to the decision by the United States District Court in
*Tribune Co. Fraudulent Conv. Litig*., Case No. 11-MD-2296 (RJS), 2018 WL 6329139, at *13–
14 (S.D.N.Y. Nov. 30, 2018),  in support of the proposition that every contract creates an
"antecedent debt" that is "owed" at the time the contract is formed, even if the contract remains
unperformed and even if the payment obligation is still contingent.  The District Court dismissed
claims in *Tribune* that sought to recover severance payments that had been made to Tribune
executives whose employment had been terminated after the completion of a leveraged buyout.
The Trustee in that case had argued that the severance payments were not liabilities that were
"incurred" until the date of termination (which happened during the two-year period that
preceded the date of the bankruptcy filing) and that the severance "obligation" therefore was an

17

obligation that the Trustee could challenge as a fraudulent transfer under section 548 of the

Bankruptcy Code.  The District Court noted that the payments had been made pursuant to the

terms of a Transitional Compensation Plan that had been in place before the two-year "reach

back" period under section 548, and therefore that the severance payments were payments of

antecedent debts and were not fraudulent transfers.  2018 WL 6329139 at *12, 15-16.

 The Trustee is correct that the cited decision by the District Court supports the

interpretation of the phrase "antecedent debt" that was adopted in *Enron.*  However, the Trustee

is wrong in contending that the District Court's decision was affirmed on appeal by the Second

Circuit Court of Appeals.  This Court has not found any rulings on appeal from the cited District

Court decision.  The Court of Appeals decision that has been cited by the Trustee, *Kirschner v.

Large S'holders (In re Tribune Co. Fraudulent Conv. Litig.*), 10 F.4th 147 (2d Cir. 2021)

("*Tribune*"), actually related to different claims.  More importantly, in that cited decision the

Court of Appeals expressed a very different view of what constitutes an "antecedent debt" from

the view expressed by the District Court in the cited *Tribune* decision and from the view

expressed by the Trustee in this case.

 One of the issues addressed by the Court of Appeals in its 2021 *Tribune* decision was

whether the payment of contingent "success fees" under financial advisory contracts constituted

the payment of "antecedent debts" that immunized the payments from attack as fraudulent

transfers pursuant to section 548 of the Bankruptcy Code.  The District Court had held that the

obligations to pay the success fees were debts that were incurred when the financial advisors'

engagement letters were signed, which happened years before the LBO's completion.

Accordingly, in the District Court's view, the success fees that the Trustee sought to claw back

had been paid with respect to antecedent debts, and the transfers were not subject to avoidance.

*See* 10 F.4th at 173.  The Court of Appeals reversed that holding, reasoning as follows:

> The pleadings record indicates that Citigroup's and Merrill Lynch's success fees ***were not debts incurred or owed*** until December 2007 when the LBO closed at step Two, at which point a triggering "Strategic Transaction" took place.  Indeed, under their engagement letters, Citigroup and Merrill Lynch were entitled to payment of their success fees only "upon consummation of a Transaction involving" Tribune. . . . Accordingly, the financial firms were only paid their success fees after the completion of Step Two and the closure of the LBO.  Further, the engagement letters required Tribune to reimburse Citigroup and Merrill Lynch for all reasonable expenses incurred in providing financial advisory services prior to the consummation of the LBO, "[r]egardless of whether any [t]ransaction [was] proposed or consummated. . . . This suggests that Tribune's obligations to pay the two $12.5 million success fees were separate, additional debts that were only payable in the event of a successful transaction.  ***Accordingly, because the success fees were only incurred upon consummation of the LBO, they were not antecedent debt constituting categorically reasonably equivalent value.***

*Id*. (emphasis added.)

It is without question (as explained above) that, for purposes of the Bankruptcy Code, the term "debt" includes any liability with respect to a "claim," even if the "liability" is contingent. In deciding whether a debt is an "antecedent" debt, however, the Court of Appeals held (in *Tribune*) that it was not enough that a contingent contractual obligation existed at a prior time. Instead, the "contingent" contractual obligations in *Tribune* were not "antecedent debts" that were "incurred" or "owed" unless and until the contingencies were triggered and the payment obligations crystalized.  In this respect, the Court of Appeals adopted a view of what constitutes an "antecedent debt," and of when an antecedent debt is "owed," that is very much at odds with the interpretation that the court adopted in *Enron* and that the Trustee has urged in this adversary proceeding.

I confess that I am confused by some aspects of the *Tribune* ruling.  The success fees that were owed to Citibank and Merrill Lynch may have been contingent at some time, but the

contingency was removed when the LBO closed, and the success fees apparently were paid after the closing occurred. I therefore am not certain why the success fee obligations were not "antecedent debts" at the time they were actually paid, even if one takes the view that a contingency had to be removed before the success fees were "owed." In addition, section 548 states that "value" is provided if a transfer satisfies or secures a "present or antecedent" debt. 11 U.S.C. § 548(d)(2)(A). Even if the success fee obligations in *Tribune* were not "antecedent" debts until contingencies were triggered, it is not clear why they were not "present" obligations at the time they were paid. Furthermore, the success fees that were paid in *Tribune* were paid under contracts that were executed more than two years prior to the bankruptcy filing, so that the contracts themselves could not be avoided under fraudulent transfer principles. Since the contract was an enforceable obligation, I am not certain why the date on which the success fee obligations accrued and actually became payable was decisive in determining whether a fraudulent transfer claim could be asserted in *Tribune*.

Those issues and difficulties, however, are for another day, and for another type of claim. What seems clear, under the holding in *Tribune*, is that a contingent contractual obligation does not give rise to an "antecedent debt" that is "incurred" or "owed" unless and until the payment obligations are actually triggered. *Tribune* addressed the meaning of "antecedent debt" in the context of fraudulent transfer claims under section 548, but I can think of no valid reason to give the phrase a different interpretation for purposes of section 547, which is part of the same set of avoidance action sections in the Bankruptcy Code. If anything, the focus in *Tribune* on when an antecedent debt is "owed" seems even more relevant to a claim under section 547, which applies only if a transfer is made after an "antecedent debt" is "owed" by a debtor.

### C.    Decisions Involving Contracts that Require Payment Before Performance

Many courts have held that payments are not "preferences" if they are made pursuant to contracts that require payments before goods or services are provided.  In determining whether an "antecedent debt" exists these decisions have focused on whether the debtor has already received the consideration for which a payment is being made, rather than focusing on the prior existence of a contract.

In the context of long-term leases, for example, a number of courts have rejected the contention that rent payments, made in advance on a monthly basis, are payments with respect to an "antecedent debt."  Instead, many courts have held that for preference purposes "[l]ease payment obligations arise when they become due and payable because of the lessee's possession, not when the lease is signed." *See, e.g., Sapir v. Eli Haddad Corp. (In re Coco)*, 67 B.R. 365, 370 (Bankr. S.D.N.Y. 1986) (citing cases).  Under these decisions, the fact that the execution of a lease occurs before the dates on which payments are made is not sufficient to invoke preference liability.  If a lease requires payments in advance for each month, then "[c]urrent rent payments are not on account of an antecedent debt; late rent payments are on account of an antecedent debt." *Husted v. Taggart (In re ECS Ref., Inc.,* 625 B.R. 425, 458 (Bankr. E.D. CA 2020).

Other courts similarly have held that if a contract for the sale of goods requires a payment before delivery, then payments made under those contracts are not payments of "antecedent debts."  In *Pirinate Consulting Grp., LLC v. Kadant Sols. Div. (In re NewPage Corp.)*, No. 11-12804 (KG), 2016 WL 5787237 (Bankr. D. Del. Sept. 30, 2016), *aff'd*, 569 B.R. 593 (D. Del. 2017) ("*NewPage*"), for example, the parties entered into a contract that governed purchase orders that would later be issued.  Certain purchase orders were later negotiated that required prepayments to be made in various stages, with full payment required before shipment.  A

litigation trustee sought to recover payments that had been made prior to NewPage's bankruptcy, arguing that the payments had been made on account of antecedent debt because the contract dates preceded the payment dates.  The Bankruptcy Court rejected that contention and granted summary judgment in favor of the defendant, holding that a debt is an "antecedent debt," for preference purposes, when the actual legal obligation to pay comes into effect, and that this occurs when the debtor receives goods and services.  2016 WL 5787237 * 3.  Since payments had been made before goods and services were provided, there was no preference.  *Id.*

The Delaware District Court affirmed the ruling in *NewPage*.  569 B.R. 593 (D. Del. 2017).  The District Court agreed that the obligation to make payment attached when goods and services were provided, and that from that perspective the payments to the creditor in *NewPage* were "prepayments" and not payments on account of antecedent debts that were already owed. *Id.* at 601-602.  The Delaware District Court cited to the *Enron* decision in *NewPage* but disagreed with its holding.  *NewPage*, 569 B.R. at 602-03.  The District Court held that "the existence of an agreement between the parties for payment in advance does not alter the conclusion that advance payments are not payments on account of antecedent debt," and that the Trustee had cited no authority requiring a contrary result and no policy that would support a contrary result.  *Id.* at 600, 603.

There is a fairly long line of decisions that take the same approach as the courts took in the *NewPage* decisions.  For example:

- In *Dots, LLC v. Capstone Media (In re DOTS, LLC)*, 533 B.R. 432 (Bankr. D.N.J. 2015), the debtors entered into a master services agreement with Capstone. Individual projects that were subject to that master agreement were outlined in separate Statements of Work that were negotiated later but that were part of the

22

master agreement.  Certain Statements of Work governed "media buying/placement" services and required that payments be made before media placements would occur. The Statements of Work also made clear media buying services would not be performed until payments were made.  The court held that the payments were prepayments because the payments preceded the provision of services and were conditions to the provision of services.  *Id*. at 438.  The contracts in *Dots* plainly were entered before the payments were made, but the advance payments for services still were not payments with respect to "antecedent debts."  *Id*. at 439-440.

- In *AFA Inv. Inc. v. Trade Source, Inc. (In re AFA Inv. Inc.)*, 538 B.R. 237 (Bankr. D. Del. 2015), the debtor executed a written brokerage agreement under which a broker sold food products to the debtor for a commission.  The contract called for the payment of monthly "retainers" of $8,333.33.  When the retainer payments were later challenged as preferences, the parties differed as to what the payments represented. The debtor contended that the monthly payments covered prior services, while the broker contended that they represented payments for the upcoming month's services. The court held that if the broker were correct then the payments would not constitute "preferences" because in that event they would be payments made before the "obligation to pay" had arisen and would be prepayments.  *Id*. at 241-2.  The court therefore denied summary judgment.

- In *Vanguard Airlines, Inc. v. Airline Automation, Inc. (In re Vanguard Airlines, Inc.)*, 295 B.R. 329 (Bankr. W.D. Mo. 2003), a software dealer entered into a contract to provide services to a debtor.  The agreement contemplated that the dealer would send monthly invoices in advance for each month's estimated charges, which amounts

would be reconciled at month's-end based on actual charges.  The vendor later issued

a notice of default for nonpayment, and the parties agreed that going forward the

debtor would make weekly payments equal to 25% of the amounts of the monthly

invoices, effectively pre-paying for each upcoming week's services rather than

prepaying for a full month at a time.  The payments post-dated the parties'

agreements and post-dated the invoices that the creditor sent, but the court rejected

the notion that each monthly payment was a payment with respect to an antecedent

debt.  *Id.* at 334-35.  Instead, the court held, the debt was "owed" when goods or

services were provided and when such performance gave rise to an actual (and not a

contingent or theoretical) legal obligation to pay. *Id.*  Since payment had been made

before the goods and services were provided, there were no payments on account of

antecedent debts.  *Id.* at 335.

- In *Rosenberg v. Rollins, Burdick, Hunter Co. (In re Presidential Airways, Inc.*), 228

    B.R. 594 (Bankr. E.D.Va. 1999), an aviation insurance broker entered into a contract

    with a debtor to obtain insurance.  The debtor made a down payment and agreed to

    make ten monthly installment payments during the life of the insurance program.  The

    debtor's payments to the broker became sporadic but never were late from the

    insurer's perspective.  When the payments were attacked as preferences, the court

    held that the question of whether an antecedent debt was owed before the payments

    were made depended on whether the creditor's right to payment had come into being.

    *Id.* at 598.  Since the insurer received payment before it rendered services (*i.e.*,

    continued insurance coverage for the upcoming month), the payments were not

    preferences.  *Id.*

Courts used to face analogous issues in applying the ordinary course of business defense under section 547(c)(2) of the Bankruptcy Code. *See* 11 U.S.C. § 547(c)(2). When originally passed, and until it was amended in 1984, section 547(c)(2) did not apply unless the "debt" that was paid was one that had been "incurred" within forty-five days prior to the payment. Some parties argued (similar to the argument made by the Trustee in this case) that every payment under a contract was a payment of a debt that had been "incurred" (in a contingent sense) as of the date of the contract itself, so that no payments made more than forty-five days after the contract was formed could be considered as having been made in the ordinary course of business. Many courts rejected this contention, holding instead that debts were "incurred," for purposes of section 547(c)(2), when a debtor "obtained a property interest in the consideration provided by the creditor that gave rise to the debt," which normally happened (in the case of a sale of goods or services) when goods and services were actually received. *See, e.g., Breeden v. L.I. Bridge Fund, L.L.C. (In re Bennett Funding Group)*, 220 B.R. 739, 742 (B.A.P. 2d. Cir. 1998); *In re Gold Coast Seed Co.*, 751 F.2d 1118, 1119 (9th Cir. 1985) (holding that a debt was "incurred" for purposes of section 547(c)(2)(B) when performance under the contract occurred, not when the original contract was signed).

The reported decisions are far from unanimous on the foregoing issues. As noted above, many courts have held that long-term leases that require periodic advance payments do not give rise to payments of "antecedent debts." Other courts have reached the opposite conclusion. *See, e.g., AERFI Group plc v. Barstow (In re MarkAir, Inc.)*, 240 B.R. 581, 592 (Bankr. D. Alaska 1999) (holding that obligations to pay future rentals were antecedent debts that were incurred at the time a lease was signed). Similarly, as noted above, many courts have held that payments made prior to the delivery of goods or services constitute "prepayments" and not payments of

"antecedent debts" that were "owed" before the payments were made.  Some other courts have reached the opposite conclusion.  *See, e.g., Dery v. Karafa (In re Dearborn Bancorp, Inc.)*, 583 B.R. 395, 406 (Bankr. E.D. Mich. 2018) (holding obligations to pay consulting payments to insiders were antecedent debts because they were incurred when the consulting agreements were signed, even if payments were at that time contingent on future performance).

However, the Trustee in this adversary proceeding has conceded that if a contract actually requires a "prepayment" – as was the case in the *NewPage* decision and in other decisions cited above – then no preference occurs when such a payment is made.  *See* Trustee's Supplemental Memorandum of Law [ECF No. 26] at 2-3.  The Trustee has explained that if a contract requires a prepayment then no "debt" is owed at the time of the prepayment, on the theory that the other party holds no right to payment "until the goods or services were provided to the debtor." *Id.*  In fact, however, the Trustee's concession as to the validity of the "prepayment" decisions cannot be squared with the Trustee's interpretation of the statute.  The gist of the Trustee's argument in this proceeding is that a contract gives rise to an obligation (even if contingent, unmatured or unliquidated) that constitutes a "debt" that is owed at the time the contract is formed.  If that is so, then every payment under every contract would be a payment of an "antecedent debt," no matter what the payment terms of the contract were and regardless of whether the contract explicitly required a payment before goods or services were delivered.  The only "prepayment" that could escape preference attack under this view would be a prepayment made at or before the time of contract formation.

Nevertheless, the Trustee has cited approvingly to *NewPage* and other decisions in which "prepayments" were required and in which payments plainly were made *after* contract formation but *before* goods or services were delivered.  *Id*. (discussing *In re NewPage Corp.*, 569 B.R. 593

26

(D. Del. 2017) and *In re Dots, LLC*, 533 B.R. 432, 440 (Bankr. D.N.J. 2015)).  That concession

by the Trustee, in combination with the *Tribune* decision, severely undercuts the statutory

argument that the Trustee has made.

There is a strong appeal to the argument that a party who has a legal right to a

prepayment should not be treated as having received a "preference" just because a contract is in

place before the payment is made.  Parties often find it necessary, or convenient, to enter into

contracts that contemplate future transactions.   If (for example) a supplier of iron ore entered

into a contract under which it would make a one-time sale of iron ore to a steel company, and if

that contract required payment two weeks before the iron ore would be shipped, then any

payment under that contract nevertheless would be a "preference" if the contract were deemed to

create an "antecedent debt."  But if the same iron ore supplier had no prior contract with the steel

company and merely quoted the same terms on which it would be willing to make a "spot" sale

(with the result that a no contract was formed until the payment was actually made), then the

same payment two weeks in advance of delivery would constitute a prepayment and would be

immune from preference attack.  It is very hard to understand any reason why the two cases

should be treated differently for preference purposes.  In each case, the iron ore supplier did not

agree to provide credit, did not actually provide credit and did not receive a payment with respect

to credit that had actually been extended, and in each case the iron ore supplier was not

"preferred" in comparison to anyone else to whom the debtor owed money.

Assume, as another example, that a debtor hires a consultant and makes an advance

payment for one year's worth of services.  All parties to this proceeding would agree that the

prepayment does not constitute a preference.  But what if the same consultant entered into a

consulting contract with the debtor that required monthly payments in advance of each month's

services?  If the contract created an "antecedent debt" then the monthly advance payments would no longer qualify as "prepayments."  The presence of the pre-existing contract would alter the result, even though the effects on other creditors would be the same in either situation.

One reason why it instinctively seems correct to say that a "prepayment" is not a "preference" is that the non-debtor parties in the "prepayment" cases have not actually extended credit to the debtor.  In the usual preference action, the "avoidance" of a transfer follows an extension of credit.  In such a case, the reversal of the transfer merely puts the parties back into a position that they previously occupied.  Notably, that is not at all what the Trustee seeks in this proceeding.  The Trustee contends that PMI actually delivered goods to a third party (not to the Trustee) and so (in the Trustee's view) the new value defense should not apply.  That would mean, if the Trustee were right, that PMI would need to return the payment that it received, even though PMI would have no right to recover the goods that it delivered (at Sharp's direction) to a third party.  The result would be to put PMI in the position that PMI *would* have occupied *if* PMI had supplied goods on credit, which is not what actually happened.  The Trustee's preference claim would not restore the parties to any position that they previously occupied; instead, it would convert PMI into a party that had extended credit to the debtor, even though PMI did not actually do so.

For all of these reasons my initial reaction, when the summary judgment motions were argued, was that it makes no sense to say that an "antecedent debt" is "owed" when the contract requires a prepayment.  After considering all the implications of this argument, however, I have to note that there is something analytically troubling with the notion that no "antecedent debt" exists under a contract that requires a prepayment.  What if, for example, the parties to such a contract agreed to terminate it, with the debtor making a payment to the other party to

compensate for the termination of the contract rights?  If no "antecedent debt" exists under such

a contract (because the debtor has not yet received consideration), does that mean that the

termination payment cannot be a preference?  Some courts have held, in fact, that payments

made in consideration for the cancellation of future contract or lease obligations are not

payments of antecedent debts and are not preferences.  *See, e.g.*, *Peltz v. Edward C. Vancil, Inc.*

*(In re Bridge Info. Sys.)*, 327 B.R. 382, 389 (8th Cir. B.A.P. 2005) (payments upon lease

termination were not damage payments but instead were payments for the surrender of lease

renewal options, and were not payments of antecedent debts), *aff'd*, 474 F.3d 1063 (8th Cir.

2007).  Most courts, however, have held that such payments are in consideration of the

cancellation of prior contract obligations and therefore are payments in respect of antecedent

debts.  *See, e.g., Feltman v. Wells Fargo Bank, N.A. (In re TS Empl., Inc.),* 597 B.R. 494, 537

(Bankr. S.D.N.Y. 2019) (payments to terminate equipment leases were on account of antecedent

debt); *see also In re Tanner Family, LLC*, 556 F.3d 1194, 1198 (11th Cir. 2009) (termination

payment was "for or on account of an antecedent debt"); *Midwest Holding # 7, LLC v. Anderson*

*(In re Tanner Family, LLC)*, 556 F.3d 1194, 1197 (11th Cir. 2009) (payments made to terminate

a lease were payments on an antecedent debt that was contingent and unmatured but that

nevertheless was created when the lease was signed); *Upstairs Gallery, Inc. v. Macklowe West*

*Dev. Co., L.P. (In re Upstairs Gallery, Inc.)*, 167 B.R. 915, 918 (9th Cir. B.A.P. 1994) (debtor

paid to terminate a five-year lease after two years; the landlord argued that the payment was not

for an antecedent debt because the rents were not yet owed, but the court held that the payment

extinguished an antecedent debt, and the fact that the debt would have continued into the future

did not change the antecedent nature of the debt).

If a payment is made after a contract is breached, or repudiated, then it ought to be clear that the breach or repudiation itself has triggered an obligation (no matter what the payment terms of the contract otherwise would have been) and therefore that the payment is on account of an "antecedent" debt. I am troubled, however, by the notion that a payment made at the time of an agreed cancellation or termination of a prior contract might be treated as though no "antecedent debt" was being paid. Plainly a termination payment in such a case is being made in respect of the "claim" that the other party has by virtue of the prior contract obligation. The termination payment cannot fairly be regarded as a payment in respect of future consideration, because the whole point of the termination is that there will not be any future consideration. The only possible explanation is that a payment is being made in compromise of a prior obligation; if that were not the case, there would be no reason for the payment in the first place.

In addition, the theory upon which the prepayment decisions rest is that there is no "legal obligation" to pay for goods or services until the payment has been "earned" through the other party's performance of its own contractual obligations. It might have made sense (in the context of contractual obligations) if section 547 had referred to payments for which consideration had already been received or for which the payment had already been earned. However, that is not what section 547 says. Instead, section 547 refers to a debt that is "owed" by a debtor. In ordinary usage, the word "owed" just refers to the fact that a payment obligation exists. A contract may require that a payment be made prior to the provision of goods or services, but the payment is still "owed" in the sense that there is a legally binding contractual obligation to make the payment, even if the payment has not yet been "earned" by the other party's performance.

The Trustee has conceded, for purposes of the pending summary judgment motions, that the "prepayment" cases were correctly decided, and I will apply that concession in ruling on the

pending motions.  It may well be, however, that the better way to deal with "prepayment" cases, conceptually, would be to acknowledge that "new value" is provided after payments are made, rather than to say that no "antecedent debt" exists.  The *Enron* approach to the interpretation of section 547 plainly would yield that result.  The decision in *Tribune* holds that an "antecedent debt" is not "owed" until a contingent obligation has been triggered and the payment obligation crystallizes.  The "prepayment" cases, however, do not involve "contingent" obligations. Instead, they simply involve contracts in which payments are required to be made before (not after) the provision of goods or services.

### D.    The *Enron* Decision

The *Enron* decision is a thoroughly-reasoned decision by a highly respected judge of this Court, and the Trustee relies on it heavily.  It is important to review *Enron* carefully and to determine if it can be reconciled with the more recent *Tribune* decision.

In *Enron*, the company had agreed to pay "retention bonuses" to a corporate officer. Payments were contingent on the completion of particular periods of service.  One such retention bonus was payable on February 1, 2001.  However, Enron paid the bonus on January 31, 2001, which was less than one year before Enron's bankruptcy filing.  The officer's estate argued that the payment had been made one day *before* it was earned and payable, and therefore that the transfer was not a payment on an "antecedent" debt.  The court disagreed.  After a lengthy review of conflicting case law and an analysis of the statutory language, the court held that the officer had a contingent right to payment at the time the contract was executed, and therefore that the payment had been made with respect to an "antecedent" debt.  *Enron*, 357 B.R. at 39-49.

One conclusion that the Court reached in *Enron* that appears to be indisputably correct is that the "due date" for a payment should not itself be conclusive in determining whether a debt is

31

"owed." If the "due date" of an obligation comes after the obligor has received the consideration

for which payment is due, then the later due date just reflects the fact that credit has been

extended. If (for example) a supplier delivers goods under the agreement that payment may be

made within 45 days, a subsequent payment unquestionably is on account of an "antecedent"

debt, even if it is made on the specified due date. The "ordinary course of business" defense may

shield a timely payment from preference attack in such a case, but that is due to the defense that

is set forth in section 507(c)(2), not because of the absence of an "antecedent debt." *See, e.g.,*

*Bennett Funding*, 220 B.R. at 741-42 (holding that an obligation is "owed" when the debtor

obtains a property interest in the consideration for which payment is due, and that if the technical

"due date" of a loan were to be used to determine whether a debt was "owed" the parties could

too easily manipulate payment dates to frustrate the plain purpose of the preference statute);

*Futoran v. Rush (In re Futoran)*, 76 F.3d 265, 267 (9th Cir. 1995) (payment of a lump sum in

satisfaction of future support payments was a preference even though the payment was made

before the obligations' due dates; the underlying obligation was unmatured but was "owed" and

was still an antecedent debt); *United States Trustee v. First Jersey Sec., Inc. (In re First Jersey*

*Sec., Inc.)*, 180 F.3d 504, 510-11 (3d Cir. 1999) (debt for legal securities was incurred when the

services were performed, not when the invoice was presented for payment).

The difficulty in trying to reconcile *Enron* with the *Tribune* decision is that the payment

obligation in *Enron* (like the payment obligation in *Tribune*) was a contingent one. In *Enron*, no

bonus was owed unless the officer's employment continued through the entirety of the relevant

period. However, there is one significant difference between the *Enron* decision and the *Tribune*

decision that may distinguish the two cases. In *Tribune*, the "success fees" were attributable to

the occurrence of a single event (not the completion of a period of service), and the Court held

that the "debt" did not exist unless and until the obligor received the consideration (namely, the closing of a transaction) for which payment would be owed.  In *Enron*, by contrast, the consideration for the payment was the officer's continued employment over a period of time. Enron had already received all (or virtually all) of the consideration for which the payment was owed, because the employee had already completed virtually the entire employment period to which the payment was attributable.  In theory the obligation to make the payment might have been canceled if the officer had not completed a few hours of additional service, but it was quite clear that this was not going to happen and that the payment had been earned.

Enron (by making the payment) effectively elected to shave a few hours off the employment period that needed to be completed before the bonus could be paid, in recognition of the inevitability that the bonus would be earned.  However, Enron was not making a payment in consideration of a present event (as in *Tribune*) or in consideration of a future event.  Enron made a payment pursuant to a prior obligation and in consideration of the benefits that Enron had already received through the officer's past employment.  Enron essentially just waived a small remaining contingency, and paid an obligation that as a practical matter had already accrued.  *Cf. In re Chase & Sanborn Corp.*, 904 F.2d 588, 595 (11th Cir. 1990) (payment made by guarantor before a guarantee was called, in anticipation of liability under the guarantee and in an effort to forestall a call on the guarantee, was a payment on an antecedent debt.)

### E.    Application of the Principles to This Adversary Proceeding

The Trustee has conceded that a payment made under a contract that actually requires a prepayment does not give rise to a preference.  The Court will accept this concession for purposes of the pending motions, though for the reasons stated above the Court is not fully comfortable with the reasoning of the prepayment decisions.  The Trustee argues, in any event,

that in this particular case there was no enforceable contractual agreement to make a prepayment.
The Court cannot definitively answer that particular question based on the record presently
before it.  The admitted purpose of the invoices was to speed up payment by the Navy and
thereby to speed up payment to PMI, and it may well have been the case that this particular
contract did contemplate that payment would be made prior to delivery.  Those particular facts,
however, are not sufficiently clear to warrant summary judgment.

On the other hand, the UCC provided PMI with a number of rights in the event of Sharp's
insolvency, no matter what the written contract terms were.  Under section 2-609 of the UCC, for
example, a party who has reasonable grounds for insecurity with respect to the performance by
the other party may demand adequate assurance of performance, and may suspend its own
performance unless and until such adequate assurance is received.  In addition, section 2-702(1)
of the UCC provides that a seller who discovers that a buyer is insolvent may refuse delivery of
goods except upon payment in cash.  The parties have admitted that at the relevant times Sharp
was unable to pay its debts as they came due, which is one of the definitions of "insolvent" under
section 1-201 of the UCC.  In fact, one of the premises of the "preference" claim is that Sharp
was insolvent at the time the payments were made.

The Trustee has argued that PMI's recourse, if "adequate assurances" had not been
provided, was to treat the contract as having been repudiated, and that PMI never treated the
contract as having been repudiated.  This argument misses the point, however.  PMI contends
that it actually received the "adequate assurances" of payment that it demanded, in the forms of
the payments that Sharp actually made.

The relevant provisions of the UCC may have given PMI the legal right to demand a
payment prior to delivery, regardless of what the written contract stated.  If so, then the legal

34

effect may have been the same as though the contract had explicitly required payment before delivery. It appears, from the few emails that have been submitted by the parties, that PMI did insist that payment be made before the goods would be delivered. However, the record is very thin on these issues; I have only a few emails without any other context and without any other testimony as to the circumstances that surrounded the payments that were made.

Furthermore, it is not entirely clear from the record whether Sharp had any accrued legal rights or title to any of the goods prior to the time that the payments were made in December 2019, and how such rights (if they existed) might have affected the determination of whether an "antecedent debt" had accrued and was "owed" before the payments were made. Neither party has briefed those issues. The Purchase Orders incorporated terms of certain government contracts, but those have not been submitted to the Court.

I believe under the circumstances that the better course is to have a full trial at which all of the relevant facts can be considered and at which the "new value" issues can also be addressed before any rulings are made by the Court.

## Conclusion

For the foregoing reasons, the parties' respective motions for summary judgment are denied. A separate order will be entered to reflect the Court's rulings. The parties will be directed to appear at a conference to discuss a schedule for the submission of a joint pretrial order and for the conduct of a trial.

Dated: New York, New York
        May 25, 2022

                            /s/ **Michael E. Wiles**
                            UNITED STATES BANKRUPTCY JUDGE